Murray ROTHSTEIN et al., on behalf of
themselves and all others similarly
situated, Plaintiffs,

v.

Al MANUTI, Al Knopf, Max L. Arons,
and Hy Jaffe, as President, Vice-President, Secretary and Treasurer, respectively, of Associated Musicians of Greater New York, Local 802, Associated Musicians of Greater New York, Local 802, an unincorporated labor organization; and the Honest Ballot Association, as agents for and acting on behalf of Associated Musicians of Greater New York, Local 802, Defendants.

United States District Court
S. D. New York.

Dec. 6, 1963.

See also D.C., 235 F.Supp. 48; D.
C., 235 F.Supp. 50.

Donald Grody, New York City, for plaintiffs.

Ashe & Rifkin, New York City, for defendants; David I. Ashe, New York City, of counsel.

LEVET, District Judge.

The plaintiffs, by order to show cause, seek a preliminary injunction enjoining a referendum and the implementation of certain resolutions amending the by-laws of the defendant Local 802. Plaintiffs, members in good standing of Local 802, are professional musicians who act as sidemen in both the single and steady engagement fields.[1] They sue in their own behalf and as representatives of a class variously alleged in the complaint to be the entire union membership and that portion of the membership which has petitioned the Local protesting certain actions. The defendants, in addition to the Local itself, are its officers and the Honest Ballot Association which, pursuant to one of the challenged resolutions, is conducting the referendum sought to be enjoined. The verified complaint alleges that the challenged resolutions are violative of Sections 101 and 501 of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 522, 535, 29 U.S.C. §§ 411, 501 (LMRDA) and Section 302 of the Labor Management Relations Act of 1947, as amended, 73 Stat. 537, 29 U.S.C. § 186 (LM RA).

There seems to be little dispute as to the facts. On September 9, 1963, Local 802's annual By-Law meeting was held. The members present approved Resolution No. 3 (Complaint Ex. C) by a vote of 683 to 319, thereby amending the By-Laws to abolish the 1½% work tax[2] and increasing the annual membership dues from $24.00 to $80.00, effective January 1, 1964. The sum of $80.00 was to include the per capita tax of the American Federation of Musicians, Local 802's parent body. (Arons Aff. p. 3)

At the same meeting, two other resolutions were enacted amending Article VIII, Section 1 and Article VII, Section 7 of the By-Laws. The amendment to Article VII, Section 1 replaced the an-

---

1. For definitions of these terms of the trade, see Cutler v. American Fed. of . Musicians, 316 F.2d 546 (2 Cir. 1963), petition for cert. filed 375 U.S. 941, 84 S. Ct. 346, 11 L.Ed.2d 272 (Sept. 16, 1963).

2. The history of the litigation involving this tax is set forth in Schwartz v. Associated Musicians, D.C., 223 F.Supp. 27, October 29, 1963.

nual September By-Law meeting with three annual By-Law meetings to be held in February, May and October respectively, and provided:

"* * * all resolutions adopted at the February and May meetings shall go into effect on July 1st, and all resolutions adopted at the October meeting shall go into effect on January 1st, unless the Resolution itself provides for a later effective date." (Complaint Ex. D)

The second lowered the quorum requirement for meetings from 500 to 250. (Complaint Ex. E) The membership did not act on Resolutions No. 21, 26, 36, 37, 38 and 39 at the meeting because prior to their being reached on the agenda there was a failure of a quorum. (Arons Aff. p. 4)

On September 12, 1963, the Local's Executive Board, acting pursuant to Article VIII, Section 3 of the By-Laws, adopted Resolutions No. 21, 26, 36, 37, 38 and 39. Article VIII, Section 3 provides:

"In the event of the failure to obtain a quorum at * * * the By-Law (September) meetings, the Executive Board has the power to act on all proposed amendments for the * * * By-Laws * * * submitted by the membership and as published in the Journal as provided for in the By-Laws." (Complaint Ex. B, p. 57)

All the resolutions adopted by the Executive Board had been, prior to the September 9th meeting, published in the Journal. (Arons Aff. p. 4)

Resolution No. 36 provided inter alia for the continuance of the 1½% work tax through December 31, 1963 and the automatic expulsion from membership for failure to pay the work dues within two weeks of a steady and four weeks of a single engagement. (Complaint Ex. F)

Resolution No. 21 amended a pre-existing By-Law which prohibited union members working in theatrical shows in which they invest money by preventing its evasion "under the name of a corpo-ration or other business entity, and/or an agent, nominee or member of his family." (Arons Aff. pp. 13–14) Resolution No. 26, introduced by the plaintiff Gurton, changed the date for regular meetings of the Local to the "third Monday of each month" at 3:00 P.M. (ibid.). The record before this court on this motion is barren as to what was effectuated by Resolutions No. 37, 38 and 39 other than the characterization in Aron's affidavit that they "merely made minor changes in the wording of some of the By-Laws to conform with the Court decisions * * *." (id. at 14)

After the membership became aware of the action at the September 9th meeting increasing the dues to $80.00 per year, many members protested the increase to the officers of the Local. (Arons Aff. Ex. 1) The Executive Board upon consideration (see Arons Aff. Ex. 2) voted unanimously, with one member absent, pursuant to Article VIII of the By-Laws to submit the issue of membership dues increase to a referendum vote. Article VIII of the By-Laws provides:

"Referendum

"* * *

"2. A referendum shall be had on any particular proposal submitted:

"(a) A referendum on said proposal is voted for by a majority of the entire Executive Board; [Complaint Ex. B, p. 58]

"* * *

"7. (a) If the membership approves any proposal in the referendum which constitutes an amendment to or alteration or change of an existing By-Law, it shall go into effect in the manner provided for by the By-Laws, as and if it had been passed at the next ensuing September (By-Law) meeting." (Id. at pp. 59–60)

The official Notice of Referendum was mailed to the membership of Local 802 on October 15, 1963 and published in the October, 1963 issue of ALLEGRO, the

official organ of Local 802. The notice provided in part:

"* * * [U]nder the authority of Article VIII of the By-Laws, the Executive Board unanimously voted on September 30, 1963 to submit to a Referendum of the entire membership an Amendment to the By-Laws of Local 802 which *repeals* the action taken at the September Meeting. The Executive Board's proposal reduces the $80.00 a year membership dues to $30.00 * and reinstates the

"* Note: We cannot go back to $24.00 a year annual dues because at the June 1963 Convention of the A.F.M. it was voted that the dues of every member of every Local be increased by $6.00 a year. This $6.00 is to be paid as per capita dues to the Federation." (Footnote and emphasis in the original.)

1½% work dues.

The referendum was to be conducted by the defendant Honest Ballot Association. The notice closed with the statement: "THE EXECUTIVE BOARD RECOMMENDS TO THE MEMBERSHIP THAT IT VOTE YES ON THE REFERENDUM BALLOT." (Arons Aff. Exs. 2 and 4)

The text of the Executive Board's Referendum Resolution provided:

"1. Resolution No. 3, as adopted at the membership meeting of September 9, 1963, be rescinded, and the amendments to the Local 802 By-Laws provided for in the said Resolution No. 3 be annulled and voided.

"2. The first paragraph of Article III, Section 6, of the By-Laws, be amended to read as follows:

" 'Section 6. In addition to any work dues required pursuant to these By-Laws, the membership dues shall be $30.00 per annum, which sum shall include the $6.00 per capita dues payable by each member to the American Federation of Musicians. The said dues shall be payable at the rate of $7.50 quarterly in advance on January 1st, April 1st, July 1st and October 1st. Members who at the time of their admission after July 16, 1932, were fifty-five (55) years of age or over, or who at the time of their admission after February 15, 1954, are forty (40) years of age or over, or their estates, are not entitled to any death benefits, insurance rights or any other pecuniary benefits even though they are to pay $30.00 per year as dues. Any members admitted after February 15, 1954, shall, if they otherwise qualify for such benefits, be entitled to death benefits, insurance rights or other pecuniary benefits only after they have been members of the Local in continuous good standing for a period of five (5) years.'

"3. The present Section 7 of Article III shall be renumbered as Section 8 and amended to read as follows:

" 'Section 8. Failure to pay any quarterly period's dues during the first month of such quarter shall increase the installment due by 25 cents, as a fine. If such fine and arrears are not fully paid before the end of that quarter, or if work dues are not paid within two weeks after a steady engagement or within four weeks after a single engagement, the membership and all rights and privileges of the one so in arrears shall be deemed automatically terminated without further notice, anything contained in these By-Laws to the contrary notwithstanding.'

"4. The word 'tax' of 1½% which has been payable by all working members and officers of the Local under the 'Standing Resolution effective as of January 1, 1961' (at pages 66–67 of the By-Laws booklet) shall be continued in effect and shall be incorporated as a new Section 7 of Article III of the By-Laws,

the remaining sections to be renumbered, and the new Section 7 to read as follows:

"'Section 7(a). In addition to any other dues provided for in these By-Laws or required to be paid pursuant to the By-Laws of the A. F. of M., there shall be paid by all members on all musical engagements work dues in the amount of 1½ per cent of the minimum wage scales earned by such members on all such musical engagements.'

"'(b). The said work dues of 1½ per cent shall also be paid by all officers of the Local, based on their salaries.

"'(c). On all steady engagements or engagements under a collective bargaining agreement, the Leader or Personnel Manager, shall collect such work dues from the sidemen working on the engagements and transmit the dues so collected, in addition to his own dues, to the Local together with the name and number of each sideman and the amount collected from him. On all other engagements, if the Leader or Personnel Manager does not collect such work dues from the sidemen for transmittal to the Local, then he shall nevertheless submit to the Local the names and card numbers of the sidemen working on the engagements. The failure or refusal of a Leader or Personnel Manager to carry out the requirements of this paragraph shall be a violation of these By-Laws for which he may be brought on charges and disciplined.'

"5. All of the foregoing shall take effect on January 1, 1964, and any contrary provisions of the By-Laws are hereby repealed."

The resolution closed with the statement: "The Executive Board of Local 802 unanimously endorses the above referendum Resolution and urges that you vote YES on the Referendum ballot."

On November 1, 1963 the Honest Ballot Association mailed "Official Referendum Ballots" to the membership of Local 802, which provided in pertinent part:

"DO YOU APPROVE THE EXECUTIVE BOARD'S RESOLUTION AMENDING THE BY-LAWS AFFECTING MEMBERSHIP DUES AND WORK DUES AS ENCLOSED?

"YES                    "NO

"MARK 'X' IN ONE BOX ONLY"

(Grody Aff. Ex. A)

———◆———

Included with the text of the Resolution and the Official Referendum Ballot there was sent an insert entitled "Clarification: Section 3 of the Referendum" and provided:

"The words 'if work dues are not paid within two weeks after a steady engagement or within four weeks after a single engagement' means two or four weeks after payment is actually received by the employed member." (Grody Aff. Ex. B)

Ballots were to be returned to the Honest Ballot Association not later than 9:00 A.M., Saturday, November 23, 1963. (Arons Aff. Ex. 3; Grody Aff. Ex. A) [3]

3. While not an official part of the record, the defendants' reply brief states that the Resolution Referendum passed by a vote of 15,396 to 3,812. For the present purposes it will be assumed the Resolution passed, for else the case might well be moot.

On November 12, 1963, the Executive Board rescinded Resolution No. 36. (Arons Aff. p. 6)

While the complaint is framed in nine causes of action, it may for the present purposes conveniently be divided into two classes; those causes of action challenging Resolutions No. 21, 26, 36, 37, 38 and 39 (causes of action 1 and 9) and those challenging the Referendum Resolution (causes of action 2 through 8, 9).

### I.

■■ The major thrust of this motion with respect to the first group of resolutions is directed against Resolution No. 36. Whatever infirmities Resolution No. 36 may have had, the entire resolution was rescinded by Local 802's Executive Board on November 12, 1963. A rescinded resolution, however abortive its birth, cannot support a preliminary injunction. There is no allegation in the papers that any funds will be expended in pursuance or implementation of Resolution No. 36. Accordingly there is no need for the injunctive relief premised on 29 U.S.C. § 501 (ninth cause of action). As for Resolutions Nos. 21, 26, 37, 38 and 39, there is nothing in this record to indicate any immediate and irreparable harm flowing to the plaintiffs from these resolutions. In fact, Resolution No. 26 was introduced by the plaintiff Gurton. (Arons Aff. p. 14) As for the other resolutions, plaintiffs' papers are virtually silent as to even the wording or purport of these resolutions. In light of the rescission of Resolution No. 36 and the inadequacy of the record as to the other resolutions, the preliminary relief must be denied.

### II.

The challenges to the referendum resolution may, for the present purposes, be conveniently placed into three groups: those challenging the referendum under (A) Title 1 of LMRDA, 29 U.S.C. § 411

(causes of action 2 through 7) ; (B) Section 302 of LMRA, 29 U.S.C. § 186 (eighth cause of action) ; and (C) Section 501 of LMRDA, 29 U.S.C. § 501 (ninth cause of action). The right of the union to conduct the referendum is unquestioned. (SM 11) The challenges are directed to the procedure and substance of the referendum.[4]

### A.  TITLE I

The first challenge to the referendum alleges that the referendum violates Section 101(a)1 and (2) of LMRDA by:

"(a) carrying on the books of the Local what amounts, in practice, to a paper membership;

"(b) affording equal voting opportunity to every member of the Local —resident within or without the jurisdiction of the Local, active or inactive in the profession;

"(c) denying the professional, working member an effective voice within his organization, and more particularly, rendering nugatory his ballot in the Referendum;

"(d) diluting, so as to make ineffective, the professional, working member's right to express his views, arguments and opinions respecting matters which vitally affect him within the organization to which he is required to belong if he wishes to continue working in his profession; and

"(e) effectively disfranchising the actively participating members of the Union and those most vitally concerned and affected by fiscal and other policy of defendant labor organization." (Complaint, par. 24)

All of these objections center about the plaintiffs' contention that the carrying on the membership rolls of persons other than professional musicians (those who earn all or the overwhelming part of their income as musicians) disenfran-

---

4. As the referendum has already been conducted, for the purposes of this motion it will be assumed that the referendum has received an affirmative vote.

See footnote 3, supra. The challenges to the conducting of the referendum will be taken as seeking a stay of its provisions.

chises those full-time musicians who have the greatest interest in the union. The complaint alleges that of the Local's total membership of 28,000, only 5,000 are professional musicians, another 5,000 are not resident within the Local's jurisdiction, and the remaining 18,000 "work only sporadically, if at all, in the music profession and do not look to music for a substantial portion of their incomes." (Complaint, par. 5)

█ Even assuming these allegations to be true, there would hardly seem to be a violation of Sections 101(a) (1) and (2). Both subsections require that "[e]very member of a labor organization" shall have equal rights (Section 101 (a) (1) and be accorded the freedom of speech and assembly (Section 101(a) (2). The wording of the statute would seem to leave little doubt that in conducting the referendum, Sections 101(a) (1) and (2) warrant every member the right to have an equal vote. The charge of "paper membership," if true, is not sufficiently supported in this record to warrant any present preliminary relief.

██ The second challenge under Title 1 centers about the Referendum Ballot requiring a single vote of YES or NO on what are alleged to be "four distinct and separate resolutions" (fourth cause of action). This feature is alleged to violate Sections 101(a) (1) and (2). The four resolutions contained in the referendum all relate to the subject of dues. The first rescinds the action taken at the September 9th meeting; the second enacts the annual dues at $30.00 per year; the third imposes a fine of 25¢ on unpaid dues and expulsion if the dues and the fine are not paid within a certain time, and the fourth reimposes the 1½% work tax previously abolished by the membership at the September 9th meeting. While the right under Section 101 (a) (1) to "vote in * * * referendums of the labor organization" embraces the right to have the referendum submitted in suitable form, Young v. Hays, 195 F.Supp. 911 (D.D.C.1961), at this preliminary stage there is considerable doubt as to whether that right is violated here.

All of the resolutions refer to the subject of dues and those members opposed to any, part, or all of them may express their dissent by voting NO.

█ The fifth cause of action challenges paragraph 3 of the Referendum Resolution which amends the By-Laws to provide that the failure to pay any quarterly dues shall increase the installment due by 25¢, as a fine, and further provides that:

"If such fine and arrears are not fully paid before the end of that quarter, or if work dues are not paid within two weeks after a steady engagement or within four weeks after a single engagement, the membership and all rights and privileges of the one so in arrears shall be deemed automatically terminated without further notice, anything contained in these By-Laws to the contrary notwithstanding."

Section 101(a) (5) provides:

"(5) Safeguards against improper disciplinary action.—No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing."

The exception contained in the statute permits the fining, suspending, expelling or disciplining of members without the statutory prerequisites for the non-payment of dues. The wording of the statute clearly permits the imposition of a fine for the non-payment of the dues. Similarly, the statute permits the expulsion for the non-payment of dues. What the challenged By-Law does is to first impose a fine and then "[i]f such fine and arrears are not fully paid before the end of that quarter, * * * the membership and all rights and privileges of the one so in arrears shall be deemed automatically terminated without further

notice * * *." The parties have cited no case in which the dues exclusion contained in Section 101(a) (5) has been construed nor has the court been able to find any. The plaintiffs' reliance upon authorities under Section 8 of the National Labor Relations Act, 29 U.S.C. § 158 would be persuasive were it not for the clear wording of the statute. The National Labor Relations Board has long taken the position, see Electric Auto-Lite Co., 92 N.L.R.B. 1073 (1950), aff'd, National Labor Relations Board v. Electric Auto-Lite Co., 196 F.2d 500 (6 Cir. 1961), cert. denied, 344 U.S. 823, 73 S.Ct. 23, 97 L.Ed. 641 (1962); Leece-Neville Co., 140 N.L.R.B. No. 2 (1962) that a labor organization restrains and coerces employees within the meaning of Section 8(b) (1) (A) when it demands that employees pay fines under the guise of a dues "discount," "rebate" or "exoneration" system. The latest in this line of cases is United Packinghouse Workers, 142 N.L.R.B. No. 84 (1963), where a union voted a monthly dues increase from three dollars to four dollars, checked off by the employer, one dollar of which, however, was refunded to the member upon his attendance at the regular monthly union meeting. The Board held that the dollar rebate was in reality a fine for non-attendance at the meeting and that the union restrains and coerces employees within the meaning of Section 8(b) (1) (A) of the Act when it demands that employees pay fines under the guise of a dues "discount" system.

These cases arise under the statute which permits a union, pursuant to a valid union security agreement, to make the payment of "periodic dues and initiation fees" a condition of employment. The collection of a fine, albeit small, under the guise of dues has been held to be an unfair labor practice. Similarly, fines for violating union rules do not come within the term "periodic dues" or initiation fees, as used in Section 8(b) (2), 29 U.S.C. § 158(b) (2), Pen & Pencil Workers Union, 91 N.L.R.B. 883 (1950).

Were the union attempting to obtain the 25¢ fine pursuant to a union security agreement, there would, under these authorities, be severe questions under Section 8 of the National Labor Relations Act. However, the statute under construction here, dealing with "[s]afeguards against improper disciplinary action," clearly provides for the fining and expulsion for the non-payment of dues. There is accordingly a lack of probable success at a plenary hearing on both this challenge and the similar challenge contained in the third cause of action.

The clarification annexed to the ballots effectively disposes of any contention that membership might be terminated for the non-payment of the work dues (1½%) without the member having received payment for his work. The clarification clearly states that the language of paragraph 3 of the referendum means "two or four weeks after payment is actually received by the employed member."

■ The Referendum Resolution provides that the "membership dues shall be $30.00 per annum, which sum shall include the $6.00 per capita dues payable by each member to the American Federation of Musicians." In prior litigation in this court, Wittstein v. American Fed. of Musicians, 63 Civ. 2548, 223 F.Supp. 27 (S.D.N.Y.1963), it was held that the procedures enacting the increase in Federation dues at its annual convention were defective under 29 U.S.C. § 411(a) (3) (B). The challenge by the plaintiffs to the referendum is that the increase to $30.00 includes the $6.00 payable to the Federation.

The inclusion of the $6.00 would hardly seem to warrant the grant of further injunctive relief in this case. The Local is already under an injunction prohibiting it from collecting the $6.00 per capita dues. Furthermore, the $6.00 is easily severable from the dues increase in the resolution as the notice of referendum makes clear so as to make the Local's dues $24.00. The denial of preliminary relief at this time is without prejudice to its renewal should the Local attempt to collect any portion of the $6.00 Feder-

ation per capita dues over and above the present amount being collected.

The last challenge premised on Title 1 is that contained in the sixth cause of action and is addressed specifically to the effective date of the Referendum Resolution, January 1, 1964. Article VIII of the By-Laws provides the effective date of a referendum which alters or amends the By-Laws is to be the same "as and if it had been passed at the next ensuing September (By-Law) meeting." The defect, the plaintiffs allege, is that there is no longer a September By-Law meeting and, hence, the effective date could not be January 1, 1964.

This challenge under Title 1 is premised on Sections 101(a) (1) and (2). It is difficult to see how the effective date of the referendum violates "section 101(a) (1) and (2) of LMRDA in that it deprives plaintiffs of their rights and privileges within the labor organization to participate in the deliberations and voting of such organization and denies to plaintiffs the right to express their views upon business properly before a duly constituted meeting * * *." (Complaint par. 38) The real basis of this cause of action is an alleged violation of the union's own By-Laws. This, however, is insufficient to support the grant of federal preliminary relief. Cf. International Ass'n of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958).

## B. SECTION 302

The cause of action asserted under Section 302 of the Taft-Hartley Act, 29 U.S.C. § 186, centers about paragraph 4 of the Referendum Resolution which requires:

"On all steady engagements or engagements under a collective bargaining agreement, the Leader or Personnel Manager, shall collect the work dues from the sidemen working on the engagements and transmit the dues so collected * * * to the Local * * *. On all other engagements * * * if the Leader or Personnel Manager does not collect such work dues from the sidemen for transmittal to the Local, then he shall nevertheless submit to the Local the names and card numbers of the sidemen working on the engagements. The failure or refusal of a Leader or Personnel Manager to carry out the requirements of this paragraph shall be a violation of these By-Laws for which he may be brought on charges and disciplined."

The foundation of this cause of action apparently rests upon the case of Cutler v. American Fed. of Musicians, 316 F.2d 546 (2 Cir. 1963), petition for cert. filed 375 U.S. 941, 84 S.Ct. 346 (U.S. Sept. 16, 1963) (No. 473), where it was held that the collection of the 1½% work tax from Cutler and those similarly circumstanced when engaged as employers in the single engagement field violated Section 302. The record on this preliminary motion does not warrant the extension of the Cutler holding to the *steady* engagement field. There is here no more proof of the employer relationship in the steady engagement field than there was in the Cutler case when a motion was recently made to extend a preliminary injunction there granted to the steady engagement field. (See Cutler v. American Fed. of Musicians, D.C., 34 F.R.D. 253 (Oct. 24, 1963).

## C. SECTION 501

From what appears above, it is clear that there is an insufficient showing to warrant the granting of any injunctive relief under Section 501, LMRDA, 29 U.S.C. § 501.

## CONCLUSION

However variously the chancellor's protective shield is invoked, the standard necessity of irreparable harm and of at least a probability of success at the plenary hearing remain indispensable. Both of these are absent here. For the reasons above stated, the plain-

tiffs' motion is denied upon this application and for this purpose.

The foregoing constitutes my Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a).

Settle order on notice.