Al GURTON and Murray Rothstein, each of them individually and on behalf of all other members of Associated Musicians of Greater New York, Local 802, American Federation of Musicians, similarly situated, Plaintiffs,

v.

Al MANUTI, as President, or Max L. Arons, as Secretary, or Al Knopf, as Vice President, or Hy Jaffe, as Treasurer of Associated Musicians of Greater New York, Local 802, American Federation of Musicians, Defendant.

United States District Court
S. D. New York.

May 8, 1964.

See also D.C., 235 F.Supp. 39.

Burton H. Hall, New York City, for plaintiffs.

Ashe & Rifkin, New York City, for defendant; David I. Ashe, New York City, of counsel.

LEVET, District Judge.

Plaintiffs, by order to show cause, seek a preliminary injunction enjoining the defendants, as officers of the Associated Musicians of Greater New York, Local 802, from "refusing to entertain the motions duly submitted by the two plaintiffs herein relative to the May 1964 bylaw meeting * * *."

Plaintiffs bring this action in their own behalf as members of Local 802, Associated Musicians of Greater New York, and for the entire membership of the Local, "especially on behalf of those members of Local 802 employed either full or part time in the music profession

as employees or 'sidemen.' "[1] The action itself continues a controversy, other features of which have been the subject of two prior actions in this court, Rothstein v. Manuti, 235 F.Supp. 39 (S.D. N.Y.1963) and Rothstein v. Manuti, 235 F.Supp. 48, Opinion No. 29,855, April 13, 1964 and an action in the New York Supreme Court, New York County, Rothstein v. Manuti, 49 CCH Lab.Cas. ¶ 51,024 (1964). Briefly, the plaintiffs, as members of Local 802, are a faction of the Union at loggerheads with the defendants, the incumbent administration of the Local. The dispute apparently centers about the proper position in the Union of full-time or part-time professional musicians, such as the plaintiffs, vis-a-vis the non-active musicians who make up the greater majority of the membership. The background of this controversy may be gleaned from the opinions previously rendered.

The present complaint alleges violations by the defendants of Sections 101 (a) (1) and 101(a) (2) of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 522, 29 U.S.C. § 411 (hereinafter LMRDA). Jurisdiction is premised on 29 U.S.C. § 412. The conduct alleged violative of LMRDA consists in the main of the Executive Board of Local 802 refusing to accept for publication and consideration at the May By-Law meeting of the Local presently scheduled for May 18, 1964 two proposed By-Law amendments submitted by the plaintiffs Gurton and Rothstein.

There is no substantial dispute as to the facts. Article VIII, Section 1 of Local 802's By-Laws requires that all proposed By-Law amendments and changes which are to be considered at the May By-Law meeting must be submitted to the Secretary of the Local on or before March 1 and that the proposed resolutions so submitted be printed in the official journal of the defendant at least thirty days prior to the meeting.

---

1. Sidemen are the instrumentalists other than the leader who play in an orchestra. See Cutler v. American Fed. of Musicians, 211 F.Supp. 433 (S.D.N.Y.1962), aff'd, 316 F.2d 546 (2nd Cir.), cert. denied 375 U.S. 941, 84 S.Ct. 346, 11 L.Ed.2d 272 (1963).

Article VIII, Section 3 requires the Executive Board to publish its report on the amendments prior to the meeting.

Prior to March 1, 1964, both the plaintiffs Gurton and Rothstein submitted proposed amendments to the By-Laws. In view of their importance on this motion, they are set forth in full. The Gurton proposal reads:

"Whereas;

"The Referendum of Feb. 15, 1964 provides for the conduct of the election of Local 802 officers, board members, and delegates by mail ballot,

and whereas;

"the said Referendum Resolution does not provide adequate safeguards for establishing the eligibility and identity of those voting in a mail election,

and whereas;

"the said Referendum Resolution in fact repeals an important safeguard previously provide [sic] by Art. VI, Sec. 8 requiring every member who desired to vote to furnish documentary proof of his identity by means of a 'certificate, registration card, or licence issued by a Municipal, State, or Federal governmental body, agency, department, or board', in addition to his Union card,

and whereas;

"the said Referendum Resolution fails to provide adequate machinery for ascertaining whether or not the members voting in a mail election are in good standing in Local 802 and in all other locals of the AFM to which they may belong, as provided by the Federation By-laws;

Therefore be it resolved;

"that a new section be added to Art. VI as amended to read as follows:

"Sec. 12   No member shall be eligible to receive a ballot or to vote in a mail election of officers, board members, and delegates unless he shall have issued to him by the Secretary of the Local a Certificate of Eligibility to Vote, identifying him by name, address, and card number as an eligible voter. Such Certificate of Eligibility shall be obtainable by applying in person to the Secretary of the Local at any time between Sept. 1st through Sept. 30th of the election year during regular business hours of the Local. Such Certificate of Eligibility shall be issued only to each member who properly identifies himself, shows that he is in good standing in all locals of the AFM to which he belongs, and signs a register which shall also clearly set forth his card number and correct address; and

Be it further resolved;

"that immediately after the close of the registration period the Secretary shall make the register available for inspection to all candidates who request such inspection. The Secretary shall further prepare printed copies of the list of all registered voters and their correct addresses and shall provide a copy of such list to each candidate for office on or before October 15th of the election year; and

Be it further resolved;

"that upon enactment this amendment may not be repealed or amended either before or after its effective date except at a duly convened membership meeting, anything to the contrary in these By-laws notwithstanding.

"/s/ Al Gurton"

The Rothstein proposal reads:

"WHEREAS:  More than 5,000 members of Local 802 live outside a 75-mile radius of New York City and have no contact with the Local, its officials, and its affairs; and

"WHEREAS:  Half of the membership did not vote in the last referendum on the subject of holding elections of officers by mail ballot, indicating that between 10,000 and

15,000 members living in New York are completely divorced from and uninterested in local union affairs; and

"WHEREAS: Many persons who are uninterested and therefore uninformed about union affairs and officials will vote a mail ballot only because it is at hand, thereby diluting the votes of those who do care and whose livelihoods are involved; and

"WHEREAS: Many thousands of Local 802's members also belong to other locals of the AFM, and a mail ballot provides no method of checking on whether they are in good standing in these other locals, thus allowing members not in good standing in the AFM (and therefore not in good standing in Local 802) to vote;

"THEREFORE BE IT RESOLVED: that the Referendum Resolution enacted on or about February 15, 1964, and which is not to be effective until July 1, 1964, pertaining to election of officers by mail ballot, is hereby rescinded and annulled as if it had never been enacted. Election of all officers of the local shall be conducted by voting in person in accordance with the presently existing By-laws of the Local; and

"BE IT FURTHER RESOLVED: that upon enactment this amendment may not be repealed or amended either before or after the effective date thereof except at a duly convened membership meeting, anything to the contrary in these By-laws notwithstanding.

"/s/ Murray Rothstein"

By identical letters mailed to each of the plaintiffs and dated April 7, 1964 the defendant Arons rejected and returned the proposals:

"Dear Sir and Brother:

"I have been instructed by the Executive Board to advise you that in view of the fact that the enclosed proposal seeks to revoke the resolutions adopted by referendum it may not be submitted again for a period of one year, under Article 8, Referendum, Section 3 of the By-Laws.

"Your resolution is therefore being returned to you.

"Fraternally yours,
"/s/ Max L. Arons
"MAX L. ARONS, Secretary
"Locl 802, A. F. of M."

No publication was made of the two proposals in the April issue of "ALLEGRO," the official publication of Local 802. This action was commenced on April 14, 1964. The May By-Law meeting is presently scheduled for May 18, 1964.

In the referendum referred to in the resolutions the membership of Local 802 voted 12,654 to 2,206 to amend the Local's By-Laws to provide that elections of officers of the Local shall hereafter be held by a referendum secret mail ballot vote to be conducted by the Honest Ballot Association. The election procedures adopted as part of the referendum contain the following provisions:

Article VI, Section 3 provides:

"Each duly nominated and qualified candidate shall have the right either in person or through a representative, to inspect the membership rolls of the Local prior to the mailing of the ballots and to be present at the counting of the ballots by the Honest Ballot Association."

Section 8 of Article VI provides:

"All members whose dues are paid through the third quarter of the election year shall be eligible to vote in the election of officers."

Section 9 provides that protests to the election can be filed with the Honest Ballot Association with a further appeal to the American Federation of Musicians, Local 802's parent group.

Section 10 of Article VI provides:

"The Honest Ballot Association shall have authority to make any investigations, including the right to

inspect any records, prior to or after the election has been completed, for the purpose of insuring an honest election."

As part of the referendum, but separately voted upon and approved 12,546 to 2,236, was the following:

"Notwithstanding any other provisions of these By-Laws, this Article [i. e., the election of officers by secret ballot mail vote, etc.] can be repealed only by a referendum mail ballot vote of the members."

██ Initially, the defendants challenge this court's jurisdiction, claiming that the complaint does no more than allege violations of the Local's By-Laws which, even if valid, are insufficient to invoke federal jurisdiction. Cited in support of the proposition are two prior decisions of this court, Rothstein v. Manuti, 235 F.Supp. 39 (S.D.N.Y.1963) and Carroll v. Associated Musicians, 33 F.R.D. 353 (S.D.N.Y.1963). It is unquestionably true that the mere fact that a violation of a union By-Law is alleged does not in and of itself give rise to a federal cause of action. See, e. g., the cases collected in Developments in the Law—Judicial Control of Actions of Private Associations, 76 Harv.L.Rev. 983 (1963). Cf. International Ass'n of Machinists v. Gonzalez, 78 S.Ct. 923, 2 L.Ed. 1018, 356 U.S. 617 (1958). However, the By-Laws are only the starting point of any analysis in determining violations of Section 101, LMRDA. As the cases make clear, even compliance with the union By-Laws may amount to a deprivation of the guaranteed rights of Section 101. See, e. g., Harvey v. Calhoon, 324 F.2d 486 (2d Cir. 1963), cert. granted 375 U.S. 991, 84 S.Ct. 633, 11 L.Ed.2d 478 (1964), where the Constitution and By-Laws, although complied with, were held to violate Section 101(a) (1), 29 U.S.C. § 411(a) (1) and Section 101(b), 29 U.S.C. § 411(b), which provides:

"Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect."

Compare Rothstein v. Manuti, supra, where, although the By-Laws were alleged to have been violated, the conduct did not amount to a deprivation of rights guaranteed by Section 101.

The inquiry must accordingly be directed towards determining whether the conduct, irrespective of its compliance with or contravention of the By-Laws and Constitution, violates the rights guaranteed by Section 101, 29 U.S.C. § 411. If a violation is shown, the court has jurisdiction under the express provisions of Section 102, 29 U.S.C. § 412. If not, the court lacks jurisdiction.

Title I of the Landrum-Griffin Act, entitled, "Bill of Rights of Members of Labor Organizations," was enacted by Congress to insure democracy in the internal government of labor unions. Section 101(a) (1) and (2) provide:

"(a) (1) Equal rights.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and by-laws.

"(2) Freedom of speech and assembly.—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor

organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations."

Both subsections (a) (1) and (a) (2) have provisions which make the members' conduct subject to the reasonable rules and regulations of the union. As originally introduced by Senator Mc-Clellan, the provisions of what was to become Title I of the Act simply guaranteed certain rights of members against infringement by labor organizations. See 105 Cong.Rec. 6475 (1959). After initial passage of the McClellan provisions, Senator Kuchel proposed an amendment, subsequently adopted, which, among other changes, added the clause, "subject to the organization's established and reasonable rules pertaining to the conduct of meetings" and the *Proviso* now found in § 101(a) (2) of the Act. See Rothman, Legislative History of the "Bill of Rights" for Union Members, 45 Minn.L.Rev. 199 (1960). These amendments were unquestionably added to insure that unions would be able to prescribe and apply reasonable rules to protect themselves against undue disruption of their institutional functions. In this case the Union seeks to justify its action on three grounds: (1) the provisions of Article VIII, Referendum, paragraph 3 of the By-Laws; (2) the provisions of the recently passed referendum, and (3) Robert's Rules of Order.

▮ Article VIII, Referendum, paragraph 3 provides:

"No proposal shall be submitted for a referendum more than once within a twelve-month period. And it shall not be permitted to submit a proposal the contents of which are similar in nature to a proposal already acted upon by referendum, unless twelve months have passed since the original proposal has been acted upon."

This provision of the By-Laws is contained in a section of Article VIII dealing with referendums. The first paragraph defines what a referendum shall be. The second provides the conditions on which a referendum "on any particular proposal" may be had. The third paragraph is quoted above. A mere reading of the third paragraph would seem to lay to rest any interpretation other than it prohibits a subsequent referendum on any proposal or similar proposal which has already been submitted to a referendum within a twelve month period. The word "proposal" in the second sentence has the same meaning as it does in the first sentence, and, in turn, the same meaning as in the second paragraph. All refer to the submission at a subsequent referendum, not a By-Law meeting.

I would be the first to pay deference to a reasonable interpretation of the Union's By-Laws by its officers in full accord with the mandate of Section 101 (a) (1). But the interpretation put forward here simply lacks any validity. The language is clear that the prohibition in the third paragraph refers only to another referendum not to subsequent amendment submitted to a By-Law meeting.

▮ And yet, even if I were to pay deference to what I find to be an unreasonable interpretation of the By-Laws this would dispose only of the Rothstein proposal and leave undecided the Gurton proposal. Simply stated, the Gurton proposal would provide that no person shall be eligible to receive a mail ballot unless he has first obtained a certificate of eligibility "by applying in person to the Secretary of the Local" during the month of September "during regular business hours of the Local." The Local's justification for the refusal to permit the membership to act on this quite reasonable proposal is that many members of Local 802 live and work outside the City of New York and others are employed in other occupations and are not free "during regular business hours of the Local" to come and register. This

explanation is totally inadequate when balanced against the importance of the rights guaranteed by Sections 101(a) (1) and (2). The Gurton proposal appears eminently reasonable on its face, proposing measures to insure that only those entitled to vote may do so. He seeks here only the right to have the membership act upon his proposal. There is nothing in the Gurton proposal which is contrary to the recently enacted referendum. The proposal seeks to insure a properly conducted mail ballot. The Executive Board has the power, in fact, the duty, to present to the membership its views concerning the proposal. It may register the opposition it apparently has to the proposal. It may urge the membership to vote against the proposal or amend it to provide for mail registration, but it may not deny the plaintiff his right to present the resolution to the membership. The membership at the meeting is free to act on the proposal as it chooses. The fact that the election procedures already contain some safeguards is no bar to having the Gurton proposal considered.

The refusal of the Executive Board to permit the membership to vote on the Rothstein and Gurton proposals would appear at this preliminary stage of the litigation to constitute a flagrant violation of the plaintiffs' rights guaranteed by Sections 101(a) (1) and 101(a) (2). This conclusion is not altered by either the provisions of Robert's Rules of Order, which by Article VII, Section 12 are applicable to union procedure, nor by the provisions of the recently completed referendum which are not effective until July 1, 1964.

The irreparable harm if relief is presently denied to the plaintiffs is clear. The proposals submitted by the plaintiffs contemplate events during the months of May and September of this year. The letter denying their resolutions was dated April 7, 1964. The May By-Law meeting was scheduled for May 18, 1964. The By-Laws required the proposed resolutions to be published at least 30 days prior to the meeting. The agenda for the May By-Law meeting contains a resolution, Resolution No. 24, which seeks to abolish the requirement of three annual By-Law meetings and substitute a single annual By-Law meeting. See affidavits submitted in Rothstein v. Manuti, 64 Civ. 890. If passed, this resolution would be effective under the By-Laws as presently constituted on July 1, 1964, thus potentially making the May By-Law meeting the last opportunity for the plaintiffs to have their resolutions concerning the election of officers acted upon prior to the presently scheduled December 1964 elections.

There seems no question but that the plaintiffs have now exhausted reasonable intra-union procedures as required by Section 101(a) (4), 29 U.S.C. § 411(a) (4). When the order to show cause was originally returnable the record was undisputed that the plaintiffs neither attempted nor did take any appeal from the decision of Local 802's Executive Board. Article VIII, Section 1 of the By-Laws of the American Federation of Musicians, Local 802's parent group, gives the plaintiffs the right to appeal to the International Executive Board from their adverse decision. Accordingly, on April 24, 1964 I entered an order holding in abeyance the plaintiffs' motion pending the timely filing of an appeal with the International Executive Board and further provided that I would stay my hand until the appeal is decided, but in no event later than May 11, 1964. The full text of the order is set forth in the margin.[2]

2. "There are in this case certain indications that the plaintiffs' rights have been violated. Plaintiffs, however, have not sought to exhaust their intra-union remedies by appealing, as is permissible by Article VIII, Sections 1 and 2, to the International Executive Board.

Upon the representations contained in the affidavit of Mr. Alfred Manuti, President of Local 802, that the provisions of those articles of the Federation's By-Laws make possible an immediate decision at a reasonable time before the May By-Law meeting, presently scheduled for May 18,.

The proof presently before me indicates that on April 25, 1964 the plaintiffs did file an appeal to the International Executive Board pursuant to Article VIII, Sections 1 and 2 of the Federation By-Laws. As part of the appeal, they sought a stay from the International President which was denied by President Kenin in a letter dated April 25, 1964. On May 8, 1964, the plaintiffs were informed that their appeals were denied.

In sum, under the facts as presented on this motion the violation of federal law is clear. The plaintiffs would suffer irreparable harm if relief is presently denied them. No contravening hardship of sufficient import would be imposed upon the defendants by the granting of injunctive relief.

At a hearing held on this motion on May 8, 1964, the parties stipulated that final judgment be entered on the record submitted on the motion for preliminary injunction. The terms of the permanent injunction order as determined with the assistance of the parties are:

(1) That the defendants be enjoined from refusing to put these two motions, the Gurton and Rothstein resolutions, on the agenda for the meeting of May 18, 1964;

(2) That appropriate notice be sent by first-class mail not later than Wednesday, May 13, 1964 to the effect that the two said resolutions will be added to the agenda of the May 18, 1964 meeting.

The defendants consented to send the notice by first-class mail and the 30-day notice provision of the By-Laws was waived by both parties.

The foregoing shall constitute my Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a).

1964, I shall hold in abeyance the plaintiffs' motion and stay my hand until May 11, 1964, upon the plaintiffs timely filing an appeal to the International Executive Board from the decision of Local 802. Article VIII, Section 2 also permits the plaintiffs to apply for a stay to the International President.

Settle order on two hours notice no later than 3:00 P.M. Monday, May 11, 1964, incorporating in the order the appropriate recitals pursuant to Fed.R. Civ.P. 65(d).

"On May 11, 1964, counsel will report to me at 10:00 A.M. in room 518 of this court house as to the progress made. In the light of the status at that time, I shall then decide the plaintiffs' motion for preliminary injunction.
"So ordered."